# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF OKLAHOMA

| UNITED STATES OF AMERICA, | ) |  |
|---|---|---|
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) | Case No. CR-15-46-D |
|  | ) |  |
| ELADIO MENDEZ-CABRERA, | ) |  |
|  | ) |  |
| Defendant. | ) |  |

**O R D E R**

Before the Court is Defendant's Motion to Suppress All Evidence and Statements [Doc. No. 26]. The government timely responded to the Motion and, on May 5, 2015, the Court conducted an evidentiary hearing.

**I.    Introduction**

Defendant, Eladio Mendez-Cabrera, is charged in a one-count Indictment with conspiracy to possess with intent to distribute 500 grams or more of methamphetamine, in violation of 21 U.S.C. § 841(a)(1). A Kansas State Highway Patrol trooper issued a warning to Defendant after a traffic stop. Thereafter, Defendant consented to the search of his vehicle. He was arrested during the course of the search when troopers suspected the presence of drugs in the front fenders of Defendant's vehicle. After his arrest, Defendant made incriminating statements to law enforcement.[1] As a result of the search, law enforcement ultimately recovered approximately seven pounds of methamphetamine from the front fenders of the vehicle.

Defendant moves to suppress both the drugs and his incriminating statements on the following grounds: (1) the traffic stop constituted an unreasonable seizure under the Fourth

---
[1] Neither party has submitted testimony or other evidence as to the substance of the incriminating statements.

Amendment; (2) Defendant's consent to search the vehicle was invalid; (3) the scope of the search exceeded the scope of any consent given by Defendant; and (4) officers unreasonably extended the duration of Defendant's detention in violation of the Fourth Amendment.

II.     **Evidence and Testimony at the Suppression Hearing**

At the suppression hearing, Kansas State Trooper Justin Rohr testified. In addition, Trooper Rohr's dash cam video of the incident was admitted into evidence without objection. The Court first addresses an issue concerning the dash cam video before discussing the evidence presented at the hearing.

Defendant submitted the dash cam video on a DVD to the Court in advance of the hearing. The parties stipulated to the Court reviewing the video prior to the hearing. At the hearing, the parties played portions of the dash cam video. The government provided the video for the hearing and played the video by connecting its computer to the Court's video display system. As more fully noted below, the video shown during the evidentiary hearing and the video on the DVD appear to have a time "tag" or "display" variance of approximately 1 to 1 ½ minutes. While the Court has no explanation for the discrepancy in time tags, the Court finds the video played at the hearing and that submitted on the DVD to the Court are otherwise identical. Moreover, the Court finds any discrepancy in time tags for critical events portrayed on the video is not material to the issues raised but notes those critical events as relevant, below. Otherwise, because the only video in the current record is the DVD submitted by Defendant in support of his motion to suppress, the Court references those times in this Order. The Court now proceeds with a discussion of the evidence presented at the hearing.

Trooper Rohr testified that he is part of the K-9 unit for the Kansas State Highway Patrol and is often involved in drug interdiction efforts. On February 3, 2015, Trooper Rohr was in a marked patrol car and parked in the median on I-70. It was a clear, windy and cold day.

Trooper Rohr observed a silver Nissan pickup truck with a Nevada license plate pass eastbound on I-70 in the right, outside lane. Trooper Rohr's interest in the pickup truck was peaked by the fact of the Nevada license plate which indicated to him that the vehicle might be transporting drugs. He pulled onto I-70 and proceeded east in the left-hand lane. He drove up beside the pickup truck to see whether the driver was wearing a seatbelt. When he confirmed the driver had his seatbelt secured, Trooper Rohr then got behind the pickup truck and continued following Defendant, heading east.

Trooper Rohr observed Defendant's vehicle following a semi truck. He noticed Defendant kept getting close to the semi truck. Although it would have been safe to pass the semi truck, Defendant did not attempt to do so. Trooper Rohr used his stopwatch and determined Defendant was following less than three seconds behind the semi tuck. He activated his lights to pull Defendant over for the traffic violation.[2]

---

[2] At the hearing, while viewing the dash cam video, Trooper Rohr identified the approximate time at which he determined Defendant was following the semi too closely. The government stopped the video at this point and the still frame was shown for a significant period of time while Trooper Rohr continued to testify. The display screen showed the time of this still frame as 3:41. The dash cam time of 3:41 is consistent with other times identified in the government's brief. *See, e.g.,* Response at p. 2 stating that Trooper Rohr activated his overhead lights at 3:44. As noted, the government played the video at the hearing by connecting its computer to the Court's video display system. On the Court's DVD copy, the point in time on the dash cam video at which Trooper Rohr activated his lights is approximately 2:25. This time is consistent with times identified in Defendant's brief. *See, e.g.,* Defendant's Motion at p. 3 identifying the time at which Defendant was stopped by Trooper Rohr as 2:27. As stated, the video shown during the evidentiary hearing and the DVD appear to have a "time tag" variance of approximately 1 to 1 ½ minutes.

Trooper Rohr testified about his extensive training on commercial vehicle safety. His training includes riding in semi trucks and observing the limited visibility to the rear. He testified that while following Defendant, he could not observe the mirrors of the semi truck from his patrol car and this was another factor that led him to believe Defendant's vehicle was following too closely to the semi truck and not at a "prudent" distance. Trooper Rohr additionally testified that the traffic on I-70 was not congested, the speed limit was 75 m.p.h. and that at the time of Defendant's traffic infraction, the semi truck was going uphill at about 65 m.p.h.

When Trooper Rohr activated his lights, Defendant immediately turned on his hazard lights and pulled over. The stop occurred at approximately 2:52 into the video. Trooper Rohr approached the passenger side of Defendant's pickup truck and advised Defendant that he pulled him over for following too closely (3:21).[3] He asked Defendant to provide his driver's license and other papers (3:28). As Defendant gathered the relevant papers, Trooper Rohr discussed with Defendant where he was going. Trooper Rohr had to repeat some of his questions and couldn't hear some of Defendant's answers (3:42). The passing traffic on the interstate was loud and Trooper Rohr testified that this – in addition to windy conditions – made it difficult to hear. Defendant responded he was going to meet his father-in-law, and so Trooper Rohr then asked Defendant where his wife lived. (4:18). Trooper Rohr looked through the papers provided by Defendant and left the passenger side to return to his patrol car to run Defendant's registration, license and insurance verification (5:00).

---

[3]Trooper Rohr made an in-court identification of Defendant as the person driving the pickup truck.

Trooper Rohr returned to the passenger side of Defendant's vehicle and handed him a warning for the traffic violation. He also returned his paperwork and told Defendant to have a safe trip (11:55). The initial traffic stop encounter lasted approximately nine minutes.

Trooper Rohr turned away from Defendant's pickup truck and began walking toward his patrol car but almost immediately turned around and returned to the passenger side of Defendant's vehicle (12:04). He asked Defendant if he could question him about a few matters but also told Defendant he was free to go (12:10). Defendant agreed to further questioning and Trooper Rohr proceeded to ask him a number of questions including questions about his travel plans that Defendant had previously answered. Defendant told Trooper Rohr he was headed to St. Louis to do roofing work with his father-in-law. Defendant answered additional questions about the nature of his work, and also answered questions about his family and the pickup truck he was driving. Trooper Rohr then told Defendant he was concerned about criminal activity on I-70 (14:42). He asked Defendant if he was transporting any illegal drugs or whether he possessed a weapon. Defendant said that he was not transporting any such contraband. Trooper Rohr then asked Defendant if he could take a look inside the pickup (14:57). Defendant consented to the search. Trooper Rohr asked permission to search the pickup truck two times and Defendant consented both times.

Trooper Rohr told Defendant to exit the vehicle. Initially, Defendant stood on the side of the road. Trooper Rohr proceeded to inspect the inside of the pickup truck, the cab and the undercarriage.

5

At approximately nineteen minutes after the stop, Trooper Rohr looked inside the engine compartment and observed tool markings on the fender bolts.[4] He testified the markings indicated to him that this might be a compartment for drugs. He further observed a hole in the fender and observed some black plastic inside the fender. Trooper Rohr then suspected Defendant might be transporting drugs. He contacted Trooper Walker to come to the scene because Trooper Walker had a fiber optic scope that would allow better means to search the contents of the fender.

Another officer, Trooper VanBuren, arrived on the scene before Trooper Walker. At that time, Trooper Rohr instructed Defendant to sit in the front seat of his patrol car to stay warm and Defendant did so. During this time, Trooper Rohr continued to search the vehicle.

Trooper Walker arrived on the scene approximately thirty-six minutes into the search. The search continued and Trooper Walker could see some clear plastic in the fender. This further indicated to Trooper Rohr that illegal narcotics were hidden in the pickup truck. Trooper Rohr eventually deployed his drug dog to conduct a sniff of the vehicle. Trooper Rohr testified that the dog was not utilized until approximately forty-one minutes into the search.[5] The dog did not alert to any drugs. Trooper Rohr testified that he did not utilize the dog at an earlier point in time because the windy conditions could compromise the dog's abilities.

Approximately forty-five minutes into the search, Defendant was arrested and read his *Miranda* rights. Trooper Rohr asked Defendant what was in the fender and Defendant responded that he did not know. Trooper Rohr testified that at no time did Defendant ever indicate he wanted the

---

[4] At the hearing, Trooper Rohr identified the time displayed on the video at which he "popped the hood" to be approximately 17:34. The DVD tags the time as approximately 19:10.

[5] The DVD of the dash cam video tags the time at 43:55.

search to stop. As set forth, ultimately law enforcement recovered approximately seven pounds of methamphetamine from the front fenders of Defendant's vehicle.

**III. Discussion**

    **A.    Validity of the Traffic Stop**

"[S]topping an automobile and detaining its occupants constitutes a 'seizure' within the meaning of [the Fourth Amendment], even though the purpose of the stop is limited and the resulting detention quite brief." *Delaware v. Prouse*, 440 U.S. 648, 653 (1979). "Whether a traffic stop is valid under the Fourth Amendment turns on whether this particular officer had reasonable suspicion that this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction." *United States v. Hunter*, 663 F.3d 1136, 1142 (10th Cir.2011) (internal quotations and citation omitted). The reasonableness of the stop is an objective inquiry and the subjective motivations of law enforcement are irrelevant. *Swanson v. Town of Mountain View, Colo.*, 577 F.3d 1196, 1201 (10th Cir. 2009).

Trooper Rohr acknowledged that the Nevada license plate on Defendant's vehicle made him suspicious of illegal drug activity and initially caused him to exit the median and pull alongside Defendant's pickup truck. Trooper Rohr did not, however, pull Defendant over at that time and his subjective intent is not relevant. Instead, Trooper Rohr pulled in behind Defendant's vehicle and followed him for a distance.[6] While following Defendant, Trooper Rohr then observed Defendant

---

[6]*See United States v. Marquez-Diaz*, 325 Fed. Appx. 637, 642 (10th Cir. 2009) ("[O]ur research [has not] revealed a constitutional requirement that law enforcement officers must have a reasonable suspicion before following a vehicle on a public roadway, even if they do so hoping to discover a violation justifying a stop.").

7

commit the traffic offense by following the semi truck too closely. Trooper Rohr pulled Defendant over on that basis.

Kansas law provides: "[t]he driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway." Kan. Stat. Ann. § 8-1523(a). Defendant contends he was following the semi truck from a distance of at least two seconds. He relies on the Kansas State Highway website which provides that generally, a two-second interval is a reasonably safe distance. *See* Defendant's Motion at p. 2, footnote 1 (citing website contents).

The Tenth Circuit has upheld the use of a two-second rule as supporting reasonable suspicion to effect a traffic stop under § 8-1523. *Hunter,* 663 F.3d at 1143. But Trooper Rohr acknowledged during his testimony that Defendant was not violating the two-second rule. Nonetheless, the two-second rule is not the exclusive basis for determining the validity of the traffic stop. *See United States v. Cortez*, 449 U.S. 411, 417 (1981) (whether reasonable suspicion exists requires the court to consider "the totality of the circumstances – the whole picture.").

In its response, the government relies on the Kansas Driving Handbook as evidence that the two second rule is not advisable "[w]hen following drivers whose view to the rear is blocked." *See* Response at p. 5. In such circumstances, a greater following distance is warranted. *Id.* Because Defendant was following a semi truck, the government contends that if more than two seconds are at play, Trooper Rohr still had reasonable suspicion that Defendant was violating § 8-1523.

Notwithstanding the two-second rule or other information contained in the Kansas Driving Handbook, Trooper Rohr's testimony sufficiently establishes grounds for determining the traffic stop was justified. *See United States v. Lyons*, 510 F.3d 1225, 1235 (10th Cir. 2007) (trooper's testimony

alone is sufficient, if credible, to establish reasonable suspicion to support traffic stop); *United States v. White*, 584 F.3d 935, 946 (10th Cir. 2009) (accord). *See also United States v. Vercher*, 358 F.3d 1257 (10th Cir. 2004) (identifying following facts under § 8-1523(a) as relevant: speed, following distance, road conditions and traffic conditions and stating that "[o]n a rural interstate in Kansas, an officer's observation of the high speed and dangerously close traveling distance provides sufficient objective justification to suspect that the distance between the vehicles is not 'reasonable and prudent'").

Trooper Rohr testified that he pulled over Defendant's vehicle for following "less than three seconds" behind the semi truck. The traffic was not congested and therefore, did not provide a justification for how close Defendant was following the semi truck. The semi truck was driving at a reduced speed and moving uphill. Trooper Rohr testified extensively, based on his training and experience, about the dangers of following a semi truck too closely and particularly emphasized a semi truck driver's limited rear visibility. Trooper Rohr testified that from his patrol car, he could not see the mirrors of the semi truck and that the driver, therefore, would not be able to see Defendant's pickup truck which was following even more closely than Trooper Rohr's patrol car.

While the two-second rule provides a gauge for determining whether a violation of § 8-1523(a) has occurred, the two-second rule is not absolute. The statute makes it illegal to follow another vehicle "more closely than is *reasonable and prudent*, having *due regard for the speed of such vehicles* and the traffic upon and the condition of the highway." *See* § 8-1523(a) (emphasis added). Trooper Rohr's testimony objectively supports a violation of the statute. The distance at which Defendant was following the semi truck was not reasonable and prudent given the limited rear visibility, the speed of the semi truck, the fact it was moving uphill and the lack of congestion on the

9

roadway. Considering the totality of the circumstances, the Court concludes the traffic stop was valid.

B.     **Consent to Further Questioning**

Defendant contends he did not objectively believe he was free to leave after Trooper Rohr issued a warning for the traffic violation, returned Defendant's papers and told him to have a safe trip. Therefore, he contends he did not consent to the additional questioning by Trooper Rohr.[7] Defendant argues "a lone motorist on a rural stretch of highway who had a poor understanding of English could not have believed he was free to depart" and relies on the nature of Trooper Rohr's questions – contending the questions had already been asked, addressed irrelevant subjects and "broached" the subject of "drugs and illegal weapons." *See* Defendant's Motion at p. 14.

"'A consensual encounter is simply the voluntary cooperation of a private citizen in response to non-coercive questioning by a law enforcement official.'" *United States v. Guerrero-Espinoza*, 462 F.3d 1302, 1308 (10th Cir. 2006) (*quoting United States v. Patten*, 183 F.3d 1190, 1194 (10th Cir.1999)). "A 'seizure,' by contrast, occurs when an individual 'has an objective reason to believe that he is not free to terminate his conversation with the officer and proceed on his way.'" *Id*. (*quoting Patten*, 183 F.3d at 1194). "'A detention for a traffic citation can turn into a consensual

---

[7]Defendant does not challenge any questioning during the initial traffic stop as unreasonably prolonging his detention. Defendant instead focuses on the length of his detention after he gave his consent. Even if Defendant had challenged any questioning during the initial encounter, the Court finds the questioning was proper and did not impermissibly prolong Defendant's detention. *See, e.g., United States v. Pettit*, – F.3d –, 2015 WL 2217115 at *3 (10th Cir. 2015) (for publication) ("It is well-established that, during a routine traffic stop, an officer may request a driver's license and registration, run requisite computer checks, and issue citations or warnings. An officer may also inquire about the driver's travel plans and ask about matters unrelated to the stop.") (citations omitted). The questions were asked in the course of Defendant retrieving his requested documentation and Trooper Rohr conducting an initial review of that documentation. The questions lasted no more than approximately two minutes.

encounter after the trooper has returned the driver his documentation so long as a reasonable person under the circumstances would believe he was free to leave or disregard the officer's request for information.'" *Id*. *(quoting United States v. Wallace*, 429 F.3d 969, 974-75 (10th Cir.2005)).

The evidence shows that Trooper Rohr issued the warning, returned Defendant's papers to him, told him to have a safe trip and turned away from Defendant's pickup truck to return to his patrol car. He then turned back and asked Defendant if he could question him but also told Defendant he was free to go. Trooper Rohr's demeanor was not threatening or coercive. Defendant agreed to answer Trooper Rohr's questions. Under these circumstances, the Court finds a reasonable person under the circumstances would believe he was free to leave or disregard Trooper Rohr's request to ask additional questions. *Compare United States v. Gregoire*, 425 F.3d 872, 879 (10th Cir.2005) (finding encounter consensual following issuance of warning and return of documentation; fact that trooper questioned defendant about matters unrelated to the traffic stop was not determinative as "there is no requirement that law enforcement advise as to the precise subject of the additional questioning" and "trooper's request to ask additional questions came in full daylight on the open road, with no physical restraint or intimidation"); *United States v. Bradford*, 423 F.3d 1149, 1159 (10th Cir. 2005) (where trooper returned documents while defendant was sitting in the patrol car and then asked if "there was anything in the [defendant's] car he needed to know about" encounter was consensual; there was no evidence trooper made a coercive show of authority such as display of weapon, physical touching or using a commanding voice). Accordingly, the encounter was a consensual one and the Fourth Amendment was not implicated by Trooper Rohr's further questioning of Defendant. *See Bradford*, 423 F.3d at 1159 ("When a driver voluntarily consents to

additional questioning, no further Fourth Amendment seizure or detention occurs.") (citation omitted).

        C.        **Voluntary Consent to the Search**

After Defendant answered several questions by Trooper Rohr about his travel, work, family and vehicle, Trooper Rohr told Defendant that he was concerned about illegal activity – including transportation of drugs and narcotics – along I-70. He asked Defendant if he had any such contraband in his vehicle. Defendant responded that he did not. Trooper Rohr then asked if he could look in his vehicle and Defendant said yes. Trooper Rohr asked him a second time to confirm he could search the vehicle and Defendant again responded affirmatively. Defendant challenges the voluntariness of this consent and contends a language barrier existed and further that he did not reasonably believe he was free to go, again relying on the fact that he was on a lone stretch of rural highway discussing criminal activity with the trooper.

The Court looks to the totality of the circumstances to determine whether Defendant gave voluntary consent to search his vehicle. *United States v. Salas*, 756 F.3d 1196, 1203 (10th Cir. 2014). Where, as the Court has found here, the initial traffic stop was valid, the voluntariness of Defendant's consent to search is established by: (1) "clear and positive testimony that consent was unequivocal and specific and freely given" and (2) "consent was given without implied or express duress or coercion." *Salas*, 756 F.3d at 1203 (10th Cir. 2014) (*quoting Lyons*, 510 F.3d at 1239). The Tenth Circuit has identified seven non-exhaustive factors to be considered when determining whether a defendant's consent to search was voluntary: (1) the threatening presence of several officers; (2) whether the officer used aggressive language and tone of voice indicating that compliance with an officer's request is compulsory, or used a pleasant manner and tone of voice; (3)

whether the officer retained the person's papers or personal effects for a long period of time, or promptly returned them; (4) whether the stop occurred in a public location, in view of others, or in a secluded locale; (5) whether the officer advised the defendant that he or she was free to leave; (6) whether the officer displayed a weapon; and (7) whether the officer physical touched the person. *See United States v. Ledesma*, 447 F.3d 1307, 1314 (10th Cir. 2006) (citations omitted).

The Court first addresses Defendant's contention that the consent was not voluntary because an obvious language barrier existed. *See* Defendant's Motion at p. 10. "In determining whether an individual has sufficient comprehension of English to provide voluntary consent, courts examine his ability to interact intelligently with the police." *United States v. Zapata*, 180 F.3d 1237, 1242 (11th Cir. 1999); *see also United States v. Ramos-Rivera*, 64 Fed. Appx. 153, 155 (10th Cir. 2003) (noting that district court cited standards for comprehension of English from *Zapata* and upholding district court's finding that defendant's comprehension was sufficient to give valid consent to search of vehicle). Sufficient comprehension is shown, for example, where the defendant has the ability to answer the officer's questions quickly and with some elaboration or to otherwise give appropriate responses to officer's questions. *Zapata,* 180 F.3d at 1242 (citing cases). *Cf United States v. Corral*, 899 F.2d 991, 994 (10th Cir. 1990) (defendant with limited knowledge of English voluntarily consented to search where defendant was able to respond to trooper's questions in English; was able to relay in English information needed by DEA agent who later interviewed him; and district court made its own observations of the defendant's conduct at the hearing – all of which established the defendant's "working knowledge of English").

Based on the review of the dash-cam video and Trooper Rohr's testimony, the Court finds Defendant had sufficient comprehension of the English language so as to allow him to interact

13

intelligently with law enforcement. Defendant responded appropriately to Trooper Rohr by providing all of the relevant documentation requested as part of the initial traffic stop. He further responded appropriately to multiple questions by Trooper Rohr about his travel plans, work, family and vehicle. In addition, Defendant was able to comply with the directions of Trooper Rohr. Furthermore, Trooper Rohr testified that it was his impression Defendant adequately understood the nature of the communications during their interaction including the giving of consent to search the pickup truck. Although there was some language difficulty, it appears to have been exacerbated by the traffic and wind noise during Trooper Rohr's exchanges with Defendant and Trooper Rohr repeated himself as necessary to ensure that he was effectively communicating with Defendant.

Moreover, considering other factors, the Court finds Defendant's consent was voluntary. There is no evidence that Trooper Rohr acted with intimidation or threats, or that other circumstances existed to establish duress or coercion. The video portrays Trooper Rohr interacting with Defendant on a professional and courteous basis. Although Defendant references the fact that he was stopped on a lone, rural highway, to the contrary the video showed that the traffic stop occurred along a well-traveled interstate during broad daylight with other traffic going by throughout the duration of the traffic stop and subsequent search. Moreover, Trooper Rohr advised Defendant that he was free to go, returned his driver's license and other paperwork before ever requesting consent and asked for Defendant's consent before the other troopers arrived. Under these circumstances, Defendant's consent was voluntary.

### D. Scope of the Search

Defendant further contends that even if he gave consent to Trooper Rohr to "look in" Defendant's vehicle, the subsequent search exceeded the scope of that consent. Defendant relies on

the fact that Trooper Rohr did much more than look inside the truck. He also looked under the hood, examined the engine compartment and – with the assistance of Trooper Walker – used a specialized scope to look inside the fender.

A vehicle search is lawful, even in the absence of probable cause or a warrant, if the vehicle's owner consents to the search. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). The scope of a search is generally defined by its expressed object and limited by the breadth of the consent given. *Florida v. Jimeno*, 500 U.S. 248, 251 (1991); *United States v. Anderson*, 114 F.3d 1059, 1065 (10th Cir. 1997). "A general grant of permission to search an automobile typically extends to the entire car, absent an objection or an explicit limitation by the grantee." *United States v. Rosborough*, 366 F.3d 1145, 1150 (10th Cir. 2004) (citation omitted). In addition, "[c]onsent to search for specific items includes consent to search those areas or containers that might reasonably contain those items." *United States v. Kimoana*, 383 F.3d 1215, 1223 (10th Cir. 2004).

Similar to the present case, in *United States v. Marquez*, 337 F.3d 1203, 1207 (10th Cir. 2003), the defendant gave consent for the police to search his RV after denying that he had drugs or guns in the RV. When searching the RV, police removed a nailed-down plywood covering on a bench seat located on the passenger side of the RV. The court held that "[b]ecause narcotics could have been secreted in the storage compartment" it was reasonable for the officer to conclude that the scope of the defendant's consent extended to the search of the storage bench. *Id*. at 1208. The court further found significant the fact that the defendant did nothing to limit the scope of the search and did not object to the officers' search of the compartment. *See id*. at 1208-09 (*citing United States v. Gordon*, 173 F.3d 761, 766 (10th Cir. 1999)).

Here, Defendant was apprised that Trooper Rohr was concerned about the transportation of drugs along I-70. It was reasonable to expect, therefore, that the search would extend to parts of the vehicle where drugs could be stored. Moreover, Defendant did not take any action to limit the scope of the search or stop the search. Therefore, the Court concludes the search did not exceed the scope of the consent given by Defendant.[8]

E.     **Duration and Breadth of the Search**

Defendant contends there was no justification for extending the duration of the stop and the breadth of the search based on the length of time – approximately forty-two minutes – between the consent given by Defendant and the "confirmation of bundles consistent with drug smuggling." *See* Defendant's Motion at p. 14. The evidence presented, however, fails to demonstrate that Defendant's consent was limited in time or location and the dash cam video shows that the troopers acted with due diligence in conducting the search. *Compare Rosborough*, 366 F.3d at 1151 (fact that one-half hour elapsed between time canine unit was called and when it arrived did not render duration of detention – lasting two and one-half hours – unreasonable or beyond scope of consent given); *see also United States v. Carbajal-Iriarte*, 586 F.3d 795, (10th Cir. 2009) (finding duration of a search that lasted over one hour to be reasonable).

---

[8]Additionally, once Trooper Rohr observed tool markings on the front fender and saw the black plastic through the opening in the fender, he testified he suspected the presence of drugs and believed that the fender might be a compartment for drugs. At that point, Trooper Rohr had "an articulable reasonable suspicion" that Defendant was engaged in illegal activity warranting an investigative detention. *See United States v. Madden*, 682 F.3d 920, 925 (10th Cir. 2012). Furthermore, "[a] police officer may conduct a warrantless search of an automobile if there is probable cause to believe that the vehicle contains contraband or other evidence which is subject to seizure under law." *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1261 (10th Cir. 2006) (quotation marks and citation omitted). Once probable cause to search is established, the officer may search the entire vehicle including any compartment that might contain contraband. *Bradford*, 423 F.3d at 1160 (citation omitted).

Indeed the Tenth Circuit has held that where, as here, the trooper asks the defendant if he has any illegal weapons or drugs, a defendant is put on notice that a search would entail "more than a cursory view of the vehicle." *Gregoire*, 425 F.3d at 880. In *Gregoire*, a forty-five minute search was held reasonable even after the trooper assured the defendant the search would be "quick." *Id*. Sometime into the search, the trooper found what appeared to be a false compartment in the vehicle and informed the suspect that the search would take "a few more minutes." The defendant did not object and the court found the forty-five minute search fell within the scope of his consent. *Id*.

Here, Trooper Rohr did not state that the search would be "quick" but instead asked if Defendant had any drugs or weapons in his vehicle and when Defendant said no, he said "do you mind if I look." Defendant knew Trooper Rohr was looking for drugs or weapons. Defendant consented to the search and never objected to the scope or duration of the search. Moreover, the troopers proceeded with diligence in conducting the search. The Court concludes, therefore, consistent with Tenth Circuit precedent addressing similar factual scenarios, that the duration of the search was within the scope of the consent given by Defendant.

Defendant further relies upon the recent decision of the United States Supreme Court, *Rodriguez v. United States*, – U.S. –, 135 S.Ct. 1609 ( 2015), to support his contention that the duration of the stop was not justified. *See id.* But Defendant's reliance on *Rodriguez* is misplaced based on the facts and circumstances of this case.

In *Rodriguez* the Court held that "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission' – to address the traffic violation that warranted the stop, and attend to related safety concerns." *Id*. at 1614 (internal citations omitted.) Thus, "[a]n officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop. But . . . he

17

may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id*. at 1615. Accordingly, the *Rodriguez* Court held that prolonging a traffic stop for seven minutes beyond the time required to address the traffic violation for the purpose of performing a drug dog sniff violated the Fourth Amendment's shield against unreasonable seizures when the officers lack reasonable suspicion or consent to prolong the seizure. *Id*. at 1612-13. The Court further held that the "critical question" is not "whether the dog sniff occurs before or after the officer issues a ticket" but "whether conducting the sniff 'prolongs' – *i.e.* adds time to – 'the stop.'" *Id*. at 1616.

As noted, Defendant does not contend that Trooper Rohr improperly prolonged the stop during the initial traffic stop. And the evidence presented does not show that during that initial stop, Trooper Rohr prolonged the stop beyond the time needed to complete his traffic-based inquiries. Instead, Defendant focuses on the "[ a]pproximately forty-two minutes [that] elapsed between the alleged giving of consent and its conclusion" and the fact that much of the time was spent "waiting for Trooper Walker to arrive with a fiberoptic scope to confirm or dispel Trooper Rohr's suspicions." *See* Motion at p. 14.

As set forth above, however, Trooper Rohr issued Defendant a warning, returned his paperwork and told Defendant he was free to go but asked Defendant if he could question him further and Defendant agreed. *See Alcaraz-Arellano*, 441 F.3d at 1259 (where trooper returned the defendant's paperwork, said "adios" but then requested permission to ask the defendant a few more questions and the defendant agreed, the additional questioning could be justified as consensual). After the two-to-three minutes of questioning, Trooper Rohr asked Defendant for his consent to search the vehicle, which Defendant provided. These facts, therefore, distinguish *Rodriguez* where

18

the traffic stop had ended and the defendant did not give consent for the officer to conduct a drug dog sniff. *Compare United States v. Iturbe-Gonzalez*, – F. Supp.3d –, 2015 WL 1843046 at * 7 (D. Mont. April 23, 2015) (for publication) (after returning all of the defendants documents and telling him to have a safe trip, trooper then obtained defendant's consent to ask him a few questions; questions lasted approximately three minutes and defendant further consented to exterior dog sniff, any additional delay caused by dog sniff was permissible under *Rodriguez* because the defendant consented to it). Moreover, as discussed above, the fact that time elapsed while waiting for Trooper Walker to arrive with the scope did not render the duration of the scope unreasonable. *Compare Rosborough*, *supra*, 366 F.3d at 1151 (addressing time waiting for drug dog to arrive).

The Court finds, therefore, that the duration and breadth of the search did not exceed the scope of the consent given by Defendant. There is no evidence that any non-consensual encounter unreasonably prolonged Defendant's detention and the search was otherwise reasonable.

## IV.    Conclusion

Having fully considered the parties' briefs, the evidence at the hearing and the applicable law, the Court concludes the government has satisfied its burden of proving that Trooper Rohr's initial traffic stop was valid, Trooper Rohr's questioning of Defendant after the traffic stop was in the course of a consensual encounter, Defendant then voluntarily consented to the search of his vehicle and the search did not exceed the scope of the consent given nor was the duration or breadth of the search unconstitutional.

IT IS THEREFORE ORDERED that Defendant's Motion to Suppress [Doc. No. 26] is DENIED.

IT IS SO ORDERED this 19th day of May, 2015.

*[signature]*

TIMOTHY D. DeGIUSTI
UNITED STATES DISTRICT JUDGE